T.C. Memo. 2006-191

UNITED STATES TAX COURT

THOMAS AND JANICE GLEASON, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 18377-04.                    Filed September 11, 2006.

During 1995, Ps, through P-H, became involved in a
leveraged buyout transaction resulting in ownership of
two S corporations, A and T, and relinquishment of an
interest in another S corporation, E.  By early 1996, A
and T were insolvent and thereafter entered bankruptcy
proceedings.

<u>Held</u>:  Ps' income and losses for 1994 and 1995
related to ownership of A, T, and E are to be adjusted
consistent with this opinion.

<u>Held</u>, <u>further</u>, Ps are liable for accuracy-related
penalties pursuant to sec. 6662, I.R.C., for 1994 and
1995 to the extent that underpayments remain following
recomputation in accordance with the Court's resolution
of substantive issues.

Thomas and Janice Gleason, pro sese.

John W. Stevens, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

WHERRY, Judge:  Respondent determined the following deficiencies and penalties with respect to petitioners' Federal income taxes:

| Year | Deficiency | Penalty Sec. 6662, I.R.C. |
|------|-----------|---------------------------|
| 1994 | $18,583 | $3,717 |
| 1995 | 663,679 | 132,736 |

After concessions, the principal issues for decision are:

(1) Whether petitioners' income for 1995 and 1996 should be increased on account of (a) their pro rata share of ordinary income from various S corporations and/or (b) property distributions from certain of the S corporations.

(2) Whether losses claimed by petitioners with respect to their interests in two of the S corporations, Alofs Manufacturing Co. (Alofs) and Target Components, Inc. (Target), should be adjusted for the years 1994 and 1995.  Subsumed in this question is the proper computation of petitioners' bases in their Alofs and Target stock.

(3) Whether petitioners are liable for the section 6662 accuracy-related penalty for 1994 and 1995.[1] Certain additional adjustments, e.g., to itemized deductions and exemption amounts, are computational in nature and will be resolved by our holdings on the foregoing issues.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulations of the parties, with accompanying exhibits, are incorporated herein by this reference. To facilitate disposition of the above issues, we shall first set forth general findings of fact and then, where appropriate, make additional findings in conjunction with our analysis of and opinion on discrete issues.

Petitioners and the S Corporations

Petitioners Thomas and Janice Gleason (individually referred to as Mr. Gleason and Mrs. Gleason, respectively) are husband and wife. On the petition filed in this case, petitioners stated that their mailing address was in Kentwood, Michigan, and their legal residence was in Long Beach, Mississippi.

The principal issues in this case revolve around Mr. Gleason's involvement with various S corporations.[2] In 1987,

---

[1] Unless otherwise indicated, section references are to the Internal Revenue Code in effect for the years in issue, and Rule references are to the Tax Court Rules of Practice and Procedure.

[2] Mrs. Gleason would appear to have had little involvement with the S corporations, and the record does not clarify the

(continued...)

Mr. Gleason purchased 35 percent of Target, a metal-stamping business, for an initial investment of $35,000. Then, in 1992, Mr. Gleason invested $50,000 in each of two related S corporations, Alofs and Excellence Manufacturing, Inc. (Excellence), in exchange for interests of 20 percent. Alofs, like Target, was a metal-stamping business, and Excellence was a seat assembly business. All three companies were engaged in supplying components to major automobile manufacturers. Mr. Gleason served as president of each of these corporations and dealt with operational aspects. A common group of investors and/or officers was involved with each of the three companies (as well as with other entities not directly relevant to the instant litigation), operating to an extent not clearly explained by the record under the name M/IC Partnership.

LBO Transaction and Aftermath

During late 1994, some shareholders in the companies became interested in restructuring or monetizing their interests to take advantage of anticipated consolidation in the automotive supply industry. Ernst & Young LLP (E&Y) was engaged to advise on

---

[2](...continued)
extent, if any, of her formal interest in the entities. She is a party to this action primarily because she filed joint returns with Mr. Gleason. While we have framed the issues in terms that would incorporate any potential joint ownership on the part of Mrs. Gleason, the underlying background and events will, for simplicity, be described largely from the perspective of Mr. Gleason's activities.

possible transactions. Based on cashflow statements and projections prepared by E&Y, Mr. Gleason ultimately agreed to participate in a leveraged buyout (LBO) transaction whereby through exchange of his Excellence shares and the assistance of outside financing, he purchased all or most of Alofs and Target from the other investors. The transaction closed in late 1995.

In connection with this transaction, Mr. Gleason as "Borrower" on December 20, 1995, executed an agreement for a term loan or loans (hereinafter referred to in the singular) from Comerica Bank (Comerica) in the aggregate amount of $6 million. The agreement contained a statement that "The proceeds of the Loan will be used for the following business purpose or purposes and no other: TO PURCHASE COMMON STOCK OF ALOFS MANUFACTURING COMPANY AND TARGET COMPONENTS, INC." On the same date, Mr. Gleason as "Pledgor" also executed a pledge agreement in favor of Comerica to secure the $6 million loan. He therein pledged as collateral 770.528 shares of Alofs and 350 shares of Target. The pledge agreement entitled petitioner to receive cash dividends and distributions arising from the collateral so long as no default on the attendant loan had occurred. In the event of a default, the pledge agreement afforded Comerica broad rights with respect to the collateral and any proceeds thereof.

The previous day, on December 19, 1995, Comerica had issued an irrevocable standby letter of credit addressed to named

beneficiary M/IC Partnership and stating as follows: "WE HEREBY OPEN OUR IRREVOCABLE STANDBY LETTER OF CREDIT NO. 531075 IN YOUR FAVOR, FOR ACCOUNT OF THOMAS E. GLEASON, * * * FOR A SUM NOT EXCEEDING SIX MILLION AND 00/100'S U.S. DOLLARS AVAILABLE BY YOUR DRAFT AT SIGHT ON COMERICA BANK".

By January of 1996, neither Alofs nor Target could make their debt payments and payroll. E&Y's asset accounting and cashflow analysis had incorporated substantial errors. Mr. Gleason informed Comerica of these developments in mid-January, and Comerica at that time began sweeping accounts held at the bank for payments on notes relating to the entities, including the $6 million note executed by Mr. Gleason and referenced above.

Both Alofs and Target filed for bankruptcy on October 30, 1996, and were completely liquidated in May of 1997. During the course of the bankruptcy proceedings, in late 1997, Comerica agreed to settle "any and all claims for avoidable transfers, whether based upon allegations of fraudulent conveyance, preferential transfer or otherwise" by paying a lump sum of $1,125,000 and funding an "LBO Litigation Fund" in an amount not to exceed $500,000. Thereafter, in May of 1999, Mr. Gleason and the bankruptcy trustee for Alofs and Target executed a settlement agreement and mutual release of claims related to the bankruptcy,

wherein Mr. Gleason also released to the trustee all potential claims against other former shareholders in the entities.

Prior to the foregoing settlement, beginning in December of 1997, Mr. Gleason had communicated with the law firm of Miller, Canfield, Paddock and Stone, P.L.C. (Miller, Canfield), with respect to possible representation of Mr. Gleason on any claims that he might have had against E&Y and other former shareholders in connection with the LBO transaction. In a letter dated December 15, 1997, the firm expressed a willingness to explore the possibility of representing Mr. Gleason but noted that the firm's provision of legal services to Comerica in the LBO transaction could present conflict issues. A series of meetings and discussions between Mr. Gleason and attorneys from Miller, Canfield took place over at least the next several months and were documented by Mr. Gleason in contemporaneous notes. The final entry, dated March 10, 1998, read:

> TALKING W/ COMERICA ABOUT PARTNERING
> & NOT GETTING
>
> AS OF END JANUARY COMERICA WANTED
> TO GO AFTER ME
>
> WILL GET BACK TO ME THIS WK
> EVEN NO NEW WORD ON COMERICA

Tax Reporting

For tax reporting purposes, Target, Alofs, and Excellence utilized a fiscal year running from October 1 through September 30. The record contains copies of Schedules K-1,

Shareholder's Share of Income, Credits, Deductions, etc., prepared for Mr. Gleason by Target for the fiscal years ending (FYE) 1990 through 1994 and 1996, by Alofs for FYE 1995 and 1996, and by Excellence for FYE 1994 through 1996.  The Schedules K-1 reflect the following amounts as Mr. Gleason's pro rata share of ordinary income (loss), of interest income, and of "Property distributions (including cash) other than dividend distributions reported to you on Form 1099-DIV":

TARGET

| FYE | Ordinary Income (Loss) | Interest Income | Property Distributions |
|-----|------------------------|-----------------|------------------------|
| 1990 | $5,675 | $3,366 | -- |
| 1991 | 101,485 | 2,670 | -- |
| 1992 | (42,242) | 2,694 | $36,400 |
| 1993 | 113,311 | 7,035 | -- |
| 1994 | 245,886 | 14,825 | 206,663 |
| 1995 | -- | -- | -- |
| 1996 | (2,893,326) | -- | -- |

ALOFS

| FYE | Ordinary Income (Loss) | Interest Income | Property Distributions |
|-----|------------------------|-----------------|------------------------|
| 1995 | $470,814 | -- | $237,000 |
| 1996 | (2,518,616) | -- | 344,082 |

EXCELLENCE

| FYE | Ordinary Income (Loss) | Interest Income | Property Distributions |
|-----|------------------------|-----------------|------------------------|
| 1994 | $312,699 | $5,260 | $140,000 |
| 1995 | 807,012 | 19,725 | 360,200 |
| 1996 | 257,328 | 7,043 | 196,000 |

The Schedules K-1 for Target and Alofs for 1996 contain handwritten notations suggesting that these schedules are amended documents and that originals reflected ordinary income (loss) of ($800,000) and zero, respectively.  Likewise, on certain copies of the Schedule K-1 from Excellence for FYE 1996, the property distribution amount of $196,000 is circled and marked with the handwritten notation "NEVER PAID".

Petitioners filed original joint Forms 1040, U.S. Individual Income Tax Return, for their 1993, 1994, 1995, and 1996 taxable (calendar) years in August of 1994, October of 1995, May of 1998, and October of 1997, respectively.  They reported thereon adjusted gross income, taxable income, and total tax as set forth below:

| Year | Adjusted Gross Income | Taxable Income | Total Tax |
|------|-----------------------|----------------|-----------|
| 1993 | $300,328 | $288,440 | $90,751 |
| 1994 | 786,481 | 766,539 | 279,854 |
| 1995 | 749,133 | 686,319 | 247,127 |
| 1996 | (581,774) | -0- | 182 |

Attached to each return were pertinent portions of Schedule E, Supplemental Income and Loss, showing income or loss from partnerships and S corporations.  The Schedules E reported income or loss from Target, Alofs, and Excellence as follows:

| Year | Target | Alofs | Excellence |
|------|--------|-------|------------|
| 1993 | $113,311 | -- | -- |
| 1994 | 245,886 | $401,192 | $312,699 |
| 1995 | (616,947) | 296,614 | 807,012 |
| 1996 | (800,000) | -0- | -- |

Included with the 1996 Schedule E was a statement pertaining to Target and a statement pertaining to Alofs indicating that the figures reported were projected amounts in that returns for the entities had not yet been filed due to recent bankruptcy. For years 1993, 1994, and 1995, petitioners also included on Schedules B, Interest and Dividend Income, taxable interest from Schedules K-1.

Subsequently, petitioners submitted joint Forms 1040X, Amended U.S. Individual Income Tax Return, signed in September of 1998, for 1993, 1994, and 1995. Each of these amended returns was based on the carryback of a net operating loss (NOL) from 1996, eliminated petitioners' taxable income for the respective periods, and requested substantial refunds. Attached to each Form 1040X was a "pro forma" Form 1040 for 1996 and supporting schedules showing the genesis of the NOL.[3] As relevant here, the principal differences between the original 1996 return and the pro forma version were the inclusion of an additional $7,043 of taxable interest and the reporting of a loss from Schedule E of

_____

[3] It is not clear from the record whether petitioners at any time in fact submitted a Form 1040X, Amended U.S. Individual Tax Return, with respect to 1996.

$5,154,614 (rather than $800,000). The Schedule E loss comprised a loss of $2,518,616 form Alofs, a loss $2,893,326 from Target, and income of $257,328 from Excellence. The changes resulted in a $4,948,548 NOL for 1996, which was then carried back to 1993, 1994, and 1995.

Respondent audited petitioners' 1993 through 1996 tax returns, and the audit resulted in proposed adjustments to all 4 years. However, the proposed adjustments generated deficiencies only with respect to 1994 and 1995. The adjustments were based on the income figures reported on petitioners' original, as opposed to amended, returns. The corrected tax liability as so adjusted was then compared to the tax liability shown on the amended returns to determine the deficiency and penalty amounts, if any, for 1993, 1994, and 1995. For 1996, the original Form 1040 and the pro forma Form 1040 reflected the same ultimate tax liability. Throughout the audit and in this litigation, petitioners have continued to assert a position with respect to a 1996 loss and attendant carrybacks consistent with that taken on their amended returns.

## OPINION

### I. Preliminary Matters--Burden of Proof

As a general rule, the Commissioner's determinations are presumed correct, and the taxpayer bears the burden of proving error therein. Rule 142(a); Welch v. Helvering, 290 U.S. 111,

115 (1933).  Section 7491 may modify the foregoing general rule in specified circumstances, with principles relevant to deficiency determinations set forth in subsection (a) and rules governing penalties and additions to tax addressed in subsection (c).

Section 7491(a)(1) may shift the burden to the Commissioner with respect to factual issues where the taxpayer introduces credible evidence, but the provision operates only where the taxpayer establishes that he or she has complied under section 7491(a)(2) with all substantiation requirements, has maintained all required records, and has cooperated with reasonable requests for witnesses, information, documents, meetings, and interviews. See H. Conf. Rept. 105-599, at 239-240 (1998), 1998-3 C.B. 747, 993-994.  Here, petitioners have made no argument directed toward burden of proof and consequently have not shown that all necessary prerequisites for a shift of burden have been met.  In addition, respondent alleged on opening brief that petitioners bear the burden of proof, and petitioners made no attempt to rebut that allegation in their reply brief.  Their reply brief does, however, at several junctures offer to present further substantiating documents to respondent and to the Court, which at minimum suggests that all pertinent information may not have been

provided during the examination.[4]  The Court therefore cannot conclude that section 7491(a) effects any shift of burden in the instant case.

Section 7491(c) provides that "the Secretary shall have the burden of production in any court proceeding with respect to the liability of any individual for any penalty, addition to tax, or additional amount imposed by this title."  The Commissioner satisfies this burden of production by "[coming] forward with sufficient evidence indicating that it is appropriate to impose the relevant penalty" but "need not introduce evidence regarding reasonable cause, substantial authority, or similar provisions." Higbee v. Commissioner, 116 T.C. 438, 446 (2001).  Rather, "it is the taxpayer's responsibility to raise those issues." Id.  The Court's conclusions with respect to burden under section 7491(c) will be detailed infra in conjunction with our discussion of the section 6662(a) penalties.

II.  General Rules--S Corporations

Sections 1366 through 1368 govern the tax treatment of S corporation shareholders with respect to their investments in such entities.  Section 1366(a)(1) provides that a shareholder shall take into account his or her pro rata share of the S corporation's items of income, loss, deduction, or credit for the

---

[4] The Court notes that petitioners have at no time submitted a specific motion to reopen the record for receipt of additional evidence.

S corporation's taxable year ending with or in the shareholder's taxable year. Stated otherwise, section 1366 establishes a regime under which items of an S corporation are generally passed through to shareholders, rather than being subject to tax at the corporate level. Section 1366(d)(1), however, limits the aggregate amount of such flowthrough losses and deductions that a shareholder may claim to the sum of (1) his or her adjusted basis in stock of the S corporation and (2) his or her adjusted basis in any indebtedness of the S corporation to the shareholder.

As regards basis, section 1012 sets forth the foundational principle that the basis of property for tax purposes shall be the cost of the property. Cost, in turn, is defined by regulation as the amount paid for the property in cash or other property. Sec. 1.1012-1(a), Income Tax Regs. Section 1367 then specifies adjustments to basis applicable to investments in S corporations. Basis in S corporation stock is increased by income passed through to the shareholder under section 1366(a)(1) and decreased by, inter alia, distributions not includable in the shareholder's income pursuant to section 1368; items of loss and deduction passed through to the shareholder under section 1366(a)(1); and certain nondeductible, noncapital expenses. Sec. 1367(a).

Section 1368 addresses treatment of distributions and differentiates between S corporations having accumulated earnings

and profits by reason of prior periods of operation as a C corporation and those without. The typical rule for entities without earnings and profits is that distributions are not included in a shareholder's gross income to extent that they do not exceed the adjusted basis of his or her stock (but are applied to reduce basis), while any distribution amount in excess of basis is treated as gain from the sale or exchange of property. Sec. 1368(b). For S corporations with accumulated earnings and profits, dividend treatment applies in enumerated circumstances. Sec. 1368(c).

III. Analysis

The crux of the dispute between the parties here involves the amount of NOL that petitioners are entitled to claim with respect to Alofs and Target in 1996 and to carry back to 1993, 1994, and 1995. This computation turns on determination of Mr. Gleason's basis in Alofs and Target, as basis limits the allowable loss pursuant to section 1366(d)(1). Likewise, the basis calculation will be affected by issues pertaining to Mr. Gleason's pro rata share of ordinary income and distributions, as these will generate adjustments to basis under section 1367(a).

A. Pro Rata Ordinary Income From Schedules K-1

Respondent contends that petitioners' income for 1995 should be adjusted to reflect an additional $438,571 as Mr. Gleason's

pro rata share of ordinary income from S corporations.  This increase is derived from Schedules K-1 and is composed of two components.  One relates to Alofs and the other to Excellence.

The Schedule K-1 for Alofs for FYE 1995 shows Mr. Gleason's share of ordinary income from the trade or business as $470,814.  Petitioners reported on Schedule E of their 1995 return only $296,614 from Alofs.  Nothing in the record elucidates the $174,200 difference, and petitioners did not address the discrepancy at trial or on brief.  Thus, absent any demonstrated basis for exclusion, the Court concludes that petitioners' income for 1995 must be increased by $174,200.

The remaining portion of the increase alleged by respondent stems from the Schedule K-1 for Excellence's FYE 1996.  This Schedule K-1 shows $257,328 of ordinary income from the trade or business and $7,043 of interest income.  Petitioners did not report these amounts on their original returns for either 1995 or 1996.  Respondent takes the position that because Mr. Gleason sold his interest in Excellence near the end of 1995, the $264,371 should be treated as received in a short taxable period ended in 1995 and, accordingly, reported in that year. Petitioners do not directly dispute respondent's position.  On brief they merely point out that they included the $264,371 on their "amended 1996 tax return".  The revised Form 1040 for 1996 attached to petitioners' Forms 1040X for each of the years 1993

through 1995 does indeed reflect additional income from Excellence on Schedule E of $257,328 and additional interest income of $7,043. Given petitioners' lack of specific dispute regarding the proper year for inclusion, the Court will sustain respondent on this issue. We note, however, that neither party has cited, nor has the Court's research revealed, any legal authority that would definitively resolve the underlying substantive question of inclusion year in these circumstances. We leave this question for another day and a more fully developed record.

B. Distributions From Schedules K-1

Mr. Gleason's Schedules K-1 from Alofs and Excellence for FYE 1995 reflect property distributions of $237,000 and $360,200, respectively, that were not reported on petitioners' 1995 return. Likewise, the Schedule K-1 from Alofs for FYE 1996 shows a property distribution of $344,082 that was not reported by petitioners. Respondent argues that these amounts are includable as dividend income, principally on account of insufficient basis to support tax-free treatment under section 1368(b)(1). Although petitioners' contentions on this point are less than clear, statements made on reply brief suggest disagreement with the premise that the distributions constitute a source of taxable income.

While the gaps in the documentary record admittedly inhibit precise computation of all relevant figures, respondent's stance would appear to be at odds with the stipulated evidence. Concerning Excellence, the parties do not dispute that Mr. Gleason made an initial contribution of $50,000 in 1992. Petitioners' 1993 return reported no income or loss from Excellence, but their 1994 and 1995 returns reported ordinary income (business income and interest income) from Excellence of $317,959 and $826,737, respectively. We have also just sustained respondent's position that an additional $264,371 should have been reported by petitioners in 1995. These income amounts would serve to increase basis. Hence, the record supports that sufficient basis was available to permit the $360,000 distributed during the entity's FYE 1995 to qualify for tax-free treatment under section 1368(b)(1). Remaining basis would then be reduced by a corresponding amount under section 1367(a)(2)(A) and would result in a decreased carryover basis upon the subsequent exchange of Excellence shares for stock in Alofs and Target.

As regards Alofs, again the parties do not dispute a $50,000 initial contribution, and petitioners reported ordinary income from Alofs of $401,192 on their 1994 return and, as we have held, are to include $470,814 for 1995. Again, these figures would seem to support tax-free return of basis treatment for the $237,000 distribution amount during the company's FYE 1995.

Treatment of the $344,082 distribution amount from the K-1 for FYE 1996 presents additional complexity in that petitioners seek to claim a $2,518,616 ordinary loss from Alofs for 1996. Pursuant to ordering rules contained in regulations promulgated under section 1367, decreases in basis attributable to losses are made before those attributable to distributions. Sec. 1.1367-1(e), Income Tax Regs. However, because the Court concludes for reasons detailed infra that the $6 million loan incurred in the LBO transaction generated basis for Mr. Gleason in Alofs and Target, his basis would appear to be adequate to accommodate both the claimed losses and tax-free return of basis treatment for the $344,082 distribution amount. Due to limitations in the record before us, we leave final calculations to the parties under Rule 155.

C. Claimed Losses and Bases

With respect to their dispute over claimed losses and bases, the parties have taken the approach of stipulating, first, the components that petitioners alleged during audit should be included in computing Mr. Gleason's bases in Alofs and Target and, second, which items were allowed and disallowed by respondent in the basis computations. At trial and on brief, each side then presented argument focused on specific disputed components. We structure our discussion in a similar manner.

The parties stipulated that petitioners alleged a $7,842,696
basis in Alofs, calculated as follows:

| | |
|---|---|
| $50,000 | Cash contribution with initial ownership of 20% |
| 6,000,000 | Loan from taxpayer through Comerica bank |
| 500,000 | Loan from selling shareholders backed by CD from taxpayer |
| 196,000 | Sales price reduction of Excellence |
| 696,696 | Portion of the sales proceeds from Excellence |
| 400,000 | Loan from Excellence to Alofs |

Respondent disallowed most of these amounts and determined a
basis in Alofs of $877,574, comprising the $50,000 contribution,
$356,760 in sales proceeds from Excellence, and the $470,814
shown on the Schedule K-1 from Alofs for FYE 1995.

The parties likewise stipulated that petitioners alleged on
audit a basis in Target of $2,138,304, which amount included the
initial investment of $35,000 and $2,103,304 in sales proceeds
from Excellence.  Respondent, in contrast, computed a basis in
Target of $584,133:

| | |
|---|---|
| $35,000 | Initial investment |
| 1,070,279 | Portion of sales proceeds from Excellence |
| (616,947) | Loss for FYE 1995 |
| (70,163) | Property distribution for FYE 1994 |
| 113,311 | Income for FYE 1993 |
| (42,242) | Loss for FYE 1992 |
| 101,485 | Income for FYE 1991 |
| 5,675 | Income for FYE 1990[5] |
| (12,265) | Loss for FYE 1989 |

Incorporated in both parties' computations as sales proceeds from
Excellence are the basis amounts transferred to Alofs and Target
upon the exchange of Excellence shares for those in Alofs and

---

[5] Although the stipulation refers to $5,673 as the amount
from the pertinent Schedule K-1, this would appear to be a
typographical error.

Target. The total claimed by petitioners ($2,800,000) was allegedly based on calculations conducted by E&Y at the time of the exchange. No documents related to that analysis were proffered as evidence. Respondent's total basis from Excellence ($1,427,039) was explained by stipulation as:

```
$50,000   Initial investment
312,699   Income from FYE 1994
807,012   Income from FYE 1995
257,328   Income from FYE 1996
```

According to stipulation, 25 percent of the Excellence stock was exchanged for Alofs and 75 percent for Target.[6]

As a threshold matter, it should be observed that both sides' computations are problematic when considered vis-a-vis the record in this case. Many of the components claimed by petitioners are unsubstantiated by any documentary evidence, and what explanations were offered at trial and on brief are opaque and rambling. Respondent's calculations, while giving an initial impression of precision, take on a seemingly inexplicable randomness when evaluated in light of the underlying record.

---

[6] While the parties' stipulations to some extent separate allegations pertaining to Alofs and Target, their discussions at trial and on brief generally address the matter of basis in the two entities in a collective sense. The evidence in the record also typically does not make a distinction. For example, the $6 million loan was to be used to purchase the stock of Alofs and Target, not just Alofs as the stipulations would suggest. Accordingly, the Court's discussion to follow will likewise proceed in a generally collective fashion.

For instance, as discussed above, respondent argues that for Excellence's FYE 1996, petitioners are required to recognize as ordinary income from Schedule K-1 both business income and interest income. However, respondent then includes only the business income in computing basis in Excellence. In fact, respondent in the proffered basis calculations generally disregards interest income reported on Schedules K-1 and/or petitioners' returns, for no apparent reason. Additionally, respondent seems in certain instances to ignore even business income from the S corporations. As one example, in arriving at basis in Target, respondent takes into account the business income or loss for FYE 1989 through 1995, with the exception of FYE 1994. Yet $245,886 of business income was reported both on Target's Schedule K-1 and on petitioners' Form 1040 for 1994. Similarly, in figuring basis in Alofs, respondent incorporates business income from FYE 1995 but ignores the $401,192 from Alofs reported by petitioners on their 1994 Form 1040. The absence of any explanation for these omissions does little to inspire confidence in respondent's position.

In contrast to the silence just described, most of the basis items claimed by petitioners were addressed in some fashion by the parties at trial or on brief. The difficulty here is that much of what was said is largely incoherent or irrelvant, leaving out what would seem to the Court to be basic, pertinent

information in favor of generalized and emotion-driven narrative. The Court is therefore left to piece together salient data to the extent possible from a limited record. We now address various claimed items in turn.

1. $6 million loan

The linchpin of petitioners' position rests in the $6 million loan from Comerica. If Mr. Gleason was in substance the borrower of the $6 million, he would be able to include that amount in computing his basis in Alofs and/or Target under either of two scenarios. As one possibility, if he used the borrowed funds to purchase stock directly from the selling shareholders, the amount would be included in his cost basis for the purchased shares. Alternatively, if he lent the funds to Alofs and/or Target, which the S corporations then used to redeem the stock of the sellers, he would obtain basis in indebtedness of the S corporation(s) to him. Conversely, if Alofs and/or Target was in substance the borrower of the $6 million, with Mr. Gleason being at most a guarantor, Mr. Gleason would not be entitled to any accretion to basis when the corporation(s) used the funds to acquire or redeem the stock from the sellers. Here, petitioners would have the Court characterize Mr. Gleason as the true borrower, while respondent maintains that the $6 million was in substance a loan to Alofs and Target.

An extensive body of caselaw establishes applicable principles in various loan situations involving S corporations and their shareholders.  Fundamentally, a shareholder may obtain or increase basis in an S corporation only if there is an economic outlay on the part of the shareholder that leaves him or her "'poorer in a material sense.'"  Perry v. Commissioner, 54 T.C. 1293, 1296 (1970) (quoting Horne v. Commissioner, 5 T.C. 250, 254 (1945)), affd. without published opinion 27 AFTR 2d 1464, 71-2 USTC par. 9502 (8th Cir. 1971); see also Maloof v. Commissioner, 456 F.3d 645, 649-650 (6th Cir. 2006), affg. T.C. Memo. 2005-75; Estate of Leavitt v. Commissioner, 875 F.2d 420, 422 (4th Cir. 1989), affg. 90 T.C. 206 (1988); Brown v. Commissioner, 706 F.2d 755, 756 (6th Cir. 1983), affg. T.C. Memo. 1981-608.  An economic outlay for this purpose includes a use of funds for which the taxpayer is directly liable in a purchase of S corporation shares, in an actual contribution of cash or property by the shareholder to the S corporation, or in a transaction that leaves the corporation indebted to the shareholder.  See Maloof v. Commissioner, supra at 649; Bergman v. United States, 174 F.3d 928, 931-932 (8th Cir. 1999); Estate of Leavitt v. Commissioner, supra at 423.  Stated otherwise, the shareholder must make an actual "'investment'" in the entity, Spencer v. Commissioner, 110 T.C. 62, 78-79 (1998) (quoting legislative history at S. Rept. 1983, 85th Cong., 2d Sess.

(1958), 1958-3 C.B. 922, 1141), thereby incurring a true "cost", Borg v. Commissioner, 50 T.C. 257, 263 (1968).

In general, no form of indirect borrowing, e.g., guaranty, surety, accommodation, comaking, pledge of collateral, etc., will give rise to the requisite economic outlay unless, until, and to the extent that the shareholder pays all or part of the obligation. Maloof v. Commissioner, supra at 649-650; Uri v. Commissioner, 949 F.2d 371, 373 (10th Cir. 1991), affg. T.C. Memo. 1989-58; Estate of Leavitt v. Commissioner, supra at 422; Brown v. Commissioner, supra at 757; Raynor v. Commissioner, 50 T.C. 762, 770-771 (1968). The Court of Appeals for the Eleventh Circuit[7] recognizes a limited exception to this rule, permitting a shareholder's guaranty of a loan to an S corporation to effect an increase in basis "'where the lender looks to the shareholder as the primary obligor'". Sleiman v. Commissioner, 187 F.3d 1352, 1357 (11th Cir. 1999) (quoting Selfe v. United States, 778

---

[7] The petition filed in this case recites: "The petitioner's [sic] mailing address for all correspondence now at: P.O. Box 8173, Kentwood, MI 49518-8173; and with legal residence now at: P.O. Box 507, Long Beach, MS 39560". Petitioners designated Detroit, Michigan, as the place of trial. Residence in Mississippi would generally imply the Court of Appeals for the Fifth Circuit as the appropriate venue for appeal. See sec. 7482(b)(1)(A). Nonetheless, the procedural history of this litigation suggests a reasonable possibility of an agreement to alter venue of appeal to the Court of Appeals for the Sixth Circuit. See sec. 7482(b)(2). In these circumstances, the Court will take into account all potentially germane precedent. See Golsen v. Commissioner, 54 T.C. 742, 757 (1970), affd. 445 F.2d 985 (10th Cir. 1971).

F.2d 769, 774 (11th Cir. 1985)), affg. T.C. Memo. 1997-530. However, even the Court of Appeals for the Eleventh Circuit affirms the general principle requiring an economic outlay, concluding merely that when the shareholder is looked to as the primary obligor, he or she has in substance borrowed the funds and advanced them to the corporation. <u>Sleiman v. Commissioner</u>, <u>supra</u> at 1357; <u>Selfe v. United States</u>, <u>supra</u> at 772-773; see also <u>Maloof v. Commissioner</u>, <u>supra</u> at 651.

It is against the foregoing backdrop that petitioners' characterization of Mr. Gleason as the true borrower versus respondent's of a loan in substance to Alofs and Target must be weighed. We observe at the outset that our task is complicated by the parties' choice not to include in the record the documents or agreement by which the share exchange was accomplished, such that we are left to glean information about the formal structure of the transaction from tangential materials. Hence, as one example, we do not even know whether the operative paperwork in form framed the LBO transaction as a purchase by Mr. Gleason or a redemption by the corporations. With such limitations in mind, we turn to the details of the parties' arguments.

Respondent's position that the $6 million was in substance a loan to Alofs and Target rests on the general premise that Mr. Gleason made no economic outlay in connection with the transaction because Comerica looked primarily to the S

corporations for repayment.  Respondent cites three particular factual circumstances in support of this stance.  First, the loan stipulated that the funds could only be utilized to obtain the shares of Alofs and Target.  Second, the Alofs and Target stock was used to collateralize the loan; petitioners pledged no personal assets.  Third, payments on the loans were made by Alofs and Target, and those payments were not treated as constructive dividends to petitioners.  Respondent contends that these facts render the case at bar analogous to Hafiz v. Commissioner, T.C. Memo. 1998-104.

In Hafiz v. Commissioner, supra, a partnership owned a motel.  One of the partners, the taxpayer-husband, decided to purchase the motel and organized an S corporation to make the acquisition.  Id.  A bank agreed to lend funds for the purchase. The S corporation, the taxpayers, and the taxpayer-husband's medical practice were named as obligors of the loan, and the proceeds thereof were required to be used to buy the motel.  Id. The loan was secured by the motel, and the taxpayer-husband was required to pledge personal assets as additional security.  Id. Although the S corporation gave the taxpayer-husband a promissory note for the amount of the loan, the corporation treated the loan on its books as from the bank, made the payments due to the bank, and deducted the interest remitted.  Id.  Neither the corporation

nor the taxpayers reported the loan payments as constructive dividends.  Id.  A second loan was structured similarly.  Id.

The taxpayers in Hafiz v. Commissioner, supra, argued that the loans should be viewed as loans to them, followed by loans from them to the S corporation.  As such, they could increase their bases and deduct losses incurred by the corporation.  Id. This Court rejected the taxpayers' plea to ignore the form of the loans and rely on the asserted economic substance, holding that the transactions were in form and substance loans from the bank to the corporation.  Id.

While certain of the facts present in Hafiz v. Commissioner, supra, have parallels here, there remains a critical difficulty with drawing an analogy from that case, or indeed from much of the body of caselaw addressing S corporation shareholders and loans.  The majority of this jurisprudence involves situations where the corporation was a (often the only) primary obligor on the loan at the time the funds were disbursed.  E.g., Sleiman v. Commissioner, supra at 1354-1355; Bergman v. United States, 174 F.3d at 929; Estate of Leavitt v. Commissioner, 875 F.2d at 421-422; Brown v. Commissioner, 706 F.2d at 756; Underwood v. Commissioner, 535 F.2d 309, 310-311 (5th Cir. 1976), affg. 63 T.C. 468 (1975); Spencer v. Commissioner, 110 T.C. at 66-67.  The shareholders were accordingly attempting to overcome the initial documentary record with a later restructuring and/or with

allegations of substance over form, which the courts have typically found insufficiently persuasive.  E.g., Sleiman v. Commissioner, 187 F.3d at 1358-1359; Bergman v. United States, supra at 932, 934; Estate of Leavitt v. Commissioner, supra at 422; Brown v. Commissioner, supra at 756; Underwood v. Commissioner, supra at 311; Spencer v. Commissioner, supra at 83-86.

That is not the scenario with which we are confronted here. To the contrary, the only original documents in the record pertaining to the $6 million show that the debt, from the outset, was in form a loan to Mr. Gleason as the sole obligor.  The stipulated loan agreement designates Mr. Gleason as the only "Borrower".  The irrevocable letter of credit that apparently made these funds available to the selling shareholders states consistently that it was opened "FOR ACCOUNT OF THOMAS E. GLEASON".[8]  Furthermore, certain facts relied upon by respondent, such as the restriction requiring proceeds to be used to purchase the Alofs and Target stock or the pledge of the shares as collateral, are not necessarily at odds with the form of the

---

[8] It is also noteworthy that the phrasing of the parties' stipulations likewise suggests a transaction that was in form a direct purchase by Mr. Gleason from the selling shareholders. One stipulation includes the statement that "petitioner [Mr. Gleason] agreed to exchange his shares in Excellence to obtain money to purchase Alofs and Target."  Another reads:  "petitioner exchanged his shares of Excellence and with the assistance of financing, became the owner of most of the remaining shares of Alofs and Target."

transaction. A stereotypical residential purchase and purchase money mortgage, for instance, bears many similarities.

Even the fact that payments on the loan were swept from corporate accounts carries little weight in the highly unusual circumstances of this case. Respondent's position rests on the proposition that Comerica looked primarily to Alofs and Target, and not to Mr. Gleason or petitioners, for repayment of the $6 million. However, the relevant time for answering this question is as of when the disbursement was made. See Delta Plastics Corp. v. Commissioner, 54 T.C. 1287, 1291 (1970) ("Whether a transfer of money creates a bona fide debt depends upon the existence of an intent by both parties, substantially contemporaneous to the time of such transfer, to establish an enforceable obligation of repayment."). The loan was executed in December of 1995. By January of 1996 the entire LBO transaction was in meltdown, and it is impossible to speculate as to how those involved might have proceeded had the buyout and underlying cashflow projections proved sustainable. Presumably, Comerica, as an independent, third-party commercial entity, did not enter the transaction expecting it to fail.

Mr. Gleason testified that the intention was for Alofs and Target to pay dividends to him, which he would then use to make payments on the $6 million loan. The sudden demise and Comerica's subsequent actions may have short circuited any such

plan, but the alleged approach is not unreasonable on its face. Nothing in the record suggests that Comerica did not, as of the date of the loan, intend to operate in accordance with this form. Notably, the pledge agreement expressly entitled Mr. Gleason to receive dividends and distributions. Suffice it to say that repayments sourced from the S corporations would go farther in overcoming the form of the loan had they occurred prior to the almost certain shock and probable visceral every-man-for-himself reaction provoked by a spectacular and unexpected commercial failure.

Moreover, the Court's recent opinion in Ruckriegel v. Commissioner, T.C. Memo. 2006-78, is instructive in this regard. That case involved taxpayers who were shareholders in an S corporation and partners in a partnership. The partnership made various borrowings from a bank and advanced funds to the S corporation in transactions taking one of two forms. Id. Most of the advances were accomplished by means of checks written directly from the partnership to the corporation; however, certain of the advances were structured as back-to-back wire transfers from the partnership to the taxpayers and then from the taxpayers to the S corporations. Id. With respect to both scenarios, principal and interest payments were made directly from the S corporation to the partnership. Id. The taxpayers argued that all transactions should be treated in substance as

back-to-back loans, thereby increasing their bases in the S corporation.  Id.

Concerning the direct checks, we noted the interest payments by the S corporation as a factor weighing against the taxpayers' attempts to reclassify the advances as back-to-back loans.  Id. In contrast, as to the wire transfers, we declined to consider the interest payments fatal when the form of the transactions was otherwise in accordance with the substance advocated by the taxpayers.  Id.  The evidence was insufficient to overcome the form of the wire transfers and show that the taxpayers were not the intended borrowers but were merely conduits to funnel funds between the entities.  Id.  We further observed that although the back-to-back structure was adopted for the purpose of achieving tax bases, such was a permissible motivation where there was a business purpose (i.e., to provide working capital for the corporation) for the loans.  Id.

Likewise, the Court concludes here that the evidence in the record on balance weighs in favor of the $6 million having been structured in form as a loan to Mr. Gleason.  Moreover, the evidence allegedly supporting a contrary substance is lacking in probative heft.  Given the surrounding circumstances and particularly the abrupt implosion of the LBO, nothing proffered convinces the Court that those involved did not intend at the time the funds were advanced to operate in accordance with the

form.  Hence, the preponderance supports petitioners' position with regard to the $6 million, and this amount is properly included in basis in Alofs and Target.

2.  $500,000 loan and $400,000 loan

Two additional amounts labeled as "loans" in the parties' stipulations are among the items claimed by petitioners to have resulted in accretions to basis.  These include $500,000 characterized as a "Loan from selling shareholders backed by CD from taxpayer" and $400,000 designated as a "Loan from Excellence to Alofs".  Petitioners' contentions with respect to these amounts can only be described as murky at best.  Petitioners on brief incorporate in a listing of various forms of consideration exchanged in the LBO transaction the statement that, after contribution of his Excellence holdings:

> Petitioner purchased with $7,160,000 in cash sellers remaining shares in Alofs and Target, with Alofs and Target assuming a $500,000 seller note backed by a Certificate of Deposit of $400,000 to be released to Petitioner upon pay down of the $500,000 seller note, plus $196,000 in Excellence dividends payable by Alofs to Petitioner upon demand * * *

Mr. Gleason also made a number of convoluted references to $500,000 and $400,000 amounts in his testimony at trial, likewise suggesting some connection between the two but leaving the Court with no clear understanding of the relationship or the intended versus actual circumstances.  For example, he stated at one point:  "As the note was paid down, that I would proportionally

get the 400,000 that was put into a CD in Alofs.  That, because

we didn't pay the $500,000 note, I couldn't draw on the 400-".

Later he remarked:  "The 400,000 shows as paid in capital by the

sellers as a tax advantage.  * * * Excellence lent it to them.

They put it in as paid in capital. * * * And so I had to effect a

$500,000, just for closing, seller note.  There was no seller

note in this transaction.  It became secured by 400,000 that was

going to be paid to me in cash."

The parties' stipulations with regard to these two amounts

read as follows:

> In regard to the $500,000 loan that the respondent did
> not allow in basis for Alofs, petitioners indicated
> that this was supposed to be received by petitioners.
> During the audit, petitioners indicated that this
> amount was never received from the selling
> shareholders, nor contributed by petitioners to Alofs.

> *     *     *     *     *     *     *

> In regard to the $400,000 that the respondent did not
> allow in basis for Alofs, petitioners advised that this
> amount was a loan from Excellence to the selling
> shareholders, and paid directly to Alofs.  Attached as
> Exhibit 23-J, is the check from Excellence to Alofs.

The referenced exhibit is a copy of a check dated December 18,

1995, in the amount of $400,000, drawn on Excellence's account

and payable to the order of Alofs.  Mr. Gleason commented on this

scenario at trial in a colloquy with the revenue agent who

audited petitioners' returns:

> Q [Mr. Gleason]  * * * Also, the $400,000 * * *
> the check being made out to Alofs, it is true it was
> made out to Alofs, didn't I tell you that it was handed

to me and I gave it to the banker after the closing and said, Put this in a CD in the company?

A [revenue agent]  I don't remember that, but if that had been the case you should have reported that $400,000 under income for 1995.

Q  Okay.  It would have been a distribution that would have reduced my basis.  Right?

A  If you had recorded the amount in income and then contributed it to Alofs, then it would be included in your basis in Alofs.

Q  Okay.  It wouldn't have been taxable then if we had already paid the taxes on that retained earnings, if it came out of Excellence retained earnings, would it not?

Suffice it to say that the foregoing record is at least confusing, if not potentially contradictory, as to petitioners' claims regarding the $500,000 and $400,000 amounts.  The only documentary evidence related to either item is the $400,000 check, suggesting a remittance that in form should not affect basis in Alofs or Target.  Conversely, nothing offered by petitioners at trial or on brief is sufficiently clear to suggest any transaction that in substance would lead to increased basis. Respondent's position as to these amounts is sustained.

### 3.  $196,000 sales price reduction

A $196,000 item is also a subject of dispute in the parties' basis computations.  According to their stipulation on this matter:  "In regard to the $196,000 that the respondent did not allow in basis for Alofs, petitioners advised that this resulted from the reduction in the sales price of Excellence by this

amount.  During the audit, it was indicated that this amounts [sic] was never paid to the petitioners or Alofs."  Certain copies of the Schedule K-1 issued to Mr. Gleason for Excellence's FYE 1996 shows a $196,000 property distribution to which a handwritten notation "NEVER PAID" has been affixed.  Petitioners do not contest that the funds were never paid; in fact, Mr. Gleason's testimony indicated that it was he who added the just-mentioned notation.

In general, petitioners' references at trial and on brief with respect to the $196,000 are akin in their rambling and nebulous tenor to those addressed above concerning the $500,000 and $400,000 amounts.  Petitioners offer on opening brief that "another $196,000 Alofs/Target stock purchase was funded by agreement not to accept $196,000 Excellence owned dividend".  On reply brief, they explain:

> Respondent's statement is correct in that it was never paid to petitioner, but was treated as a reduction in cash required for purchase of stock from sellers, and Comerica agreed to permit Petitioner to withdraw $196,000 from companies without bank restrictions by April 10, 1996.  Because of the cash poor conditions of the company, Petitioner elected To leave this money in the company until cash was available. * * *

Mr. Gleason's testimony at trial continued in a similar vein, characterizing the $196,000 as some form of foregone distribution.

Again, the Court is lacking in any clear evidence as to precisely what transpired with respect to the $196,000 or how it

was accounted for by those involved in the LBO transaction. In general, funds neither received by petitioners nor reported by them as income would not be considered as contributions by them to another entity such as would result in an increased basis. On this record, vague allegations of a substance that might support basis are insufficient to overcome the general rules.

4. Excellence sales price proceeds

The final component specifically addressed by the parties in their stipulations regarding their respective computations of basis in Alofs and Target is the sum attributable to the Excellence shares exchanged in the LBO. As mentioned supra in our preliminary discussion concerning general computational problems, petitioners claimed a total of $2,800,000 in sales proceeds from Excellence, based allegedly on computations performed by E&Y at the time of the exchange. Mr. Gleason also testified that he "ended up surrendering my stock in Excellence for the benefit of reducing the subordinated debt by 2.8 million", but again no operative documents from the LBO transaction elucidate this statement or the precise treatment of the Excellence shares by those involved. Respondent allowed a total of $1,427,039. To once more reprise our earlier remarks, neither calculation is adequately supported or explained by the record. No documentary evidence corroborates petitioners' assertions, and respondent's position is difficult to square with

the tax returns and forms on which it purportedly relies. Furthermore, adjustments may be rendered necessary by the Court's holdings on other issues. Thus, while we reject petitioners' $2,800,000 for lack of evidence, we would expect that as part of the parties' Rule 155 computations, revised calculations consistent with this opinion would retrace the basis of the exchanged Excellence shares.

### D. Accuracy-Related Penalty

Subsection (a) of section 6662 imposes an accuracy-related penalty in the amount of 20 percent of any underpayment that is attributable to causes specified in subsection (b). Subsection (b) of section 6662 then provides that among the causes justifying imposition of the penalty are: (1) Negligence or disregard of rules or regulations and (2) any substantial understatement of income tax.

"Negligence" is defined in section 6662(c) as "any failure to make a reasonable attempt to comply with the provisions of this title", and "disregard" as "any careless, reckless, or intentional disregard." Caselaw similarly states that "'Negligence is a lack of due care or the failure to do what a reasonable and ordinarily prudent person would do under the circumstances.'" Freytag v. Commissioner, 89 T.C. 849, 887 (1987) (quoting Marcello v. Commissioner, 380 F.2d 499, 506 (5th Cir. 1967), affg. on this issue 43 T.C. 168 (1964) and T.C. Memo.

1964-299), affd. 904 F.2d 1011 (5th Cir. 1990), affd. 501 U.S. 868 (1991). Pursuant to regulations, "'Negligence' also includes any failure by the taxpayer to keep adequate books and records or to substantiate items properly." Sec. 1.6662-3(b)(1), Income Tax Regs.

A "substantial understatement" is declared by section 6662(d)(1) to exist where the amount of the understatement exceeds the greater of 10 percent of the tax required to be shown on the return for the taxable year or $5,000 ($10,000 in the case of a corporation). For purposes of this computation, the amount of the understatement is reduced to the extent attributable to an item: (1) For which there existed substantial authority for the taxpayer's treatment thereof, or (2) with respect to which relevant facts were adequately disclosed on the taxpayer's return or an attached statement and there existed a reasonable basis for the taxpayer's treatment of the item. See sec. 6662(d)(2)(B).

An exception to the section 6662(a) penalty is set forth in section 6664(c)(1) and reads: "No penalty shall be imposed under this part with respect to any portion of an underpayment if it is shown that there was a reasonable cause for such portion and that the taxpayer acted in good faith with respect to such portion."

Regulations interpreting section 6664(c) state:

The determination of whether a taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all pertinent facts and circumstances. * * * Generally, the most important

factor is the extent of the taxpayer's effort to assess the taxpayer's proper tax liability. * * * [Sec. 1.6664-4(b)(1), Income Tax Regs.]

Reliance upon the advice of a tax professional may, but does not necessarily, demonstrate reasonable cause and good faith in the context of the section 6662(a) penalty.  Id.; see also United States v. Boyle, 469 U.S. 241, 251 (1985); Freytag v. Commissioner, supra at 888.  Such reliance is not an absolute defense, but it is a factor to be considered.  Freytag v. Commissioner, supra at 888.

In order for this factor to be given dispositive weight, the taxpayer claiming reliance on a professional must show, at minimum:  "(1) The adviser was a competent professional who had sufficient expertise to justify reliance, (2) the taxpayer provided necessary and accurate information to the adviser, and (3) the taxpayer actually relied in good faith on the adviser's judgment."  Neonatology Associates, P.A. v. Commissioner, 115 T.C. 43, 99 (2000), affd. 299 F.3d 221 (3d Cir. 2002); see also, e.g.,  Charlotte's Office Boutique, Inc. v. Commissioner, 425 F.3d 1203, 1212 & n.8 (9th Cir. 2005) (quoting verbatim and with approval the above three-prong test), affg. 121 T.C. 89 (2003); Westbrook v. Commissioner, 68 F.3d 868, 881 (5th Cir. 1995), affg. T.C. Memo. 1993-634; Cramer v. Commissioner, 101 T.C. 225, 251 (1993), affd. 64 F.3d 1406 (9th Cir. 1995); Ma-Tran Corp. v. Commissioner, 70 T.C. 158, 173 (1978); Pessin v. Commissioner, 59

T.C. 473, 489 (1972); <u>Ellwest Stereo Theatres v. Commissioner</u>,
T.C. Memo. 1995-610.

As previously indicated, section 7491(c) places the burden
of production on the Commissioner.  The notice of deficiency
issued to petitioners asserted applicability of the section
6662(a) penalty on account of both negligence and/or substantial
understatement.  See sec. 6662(b).  Respondent in his pretrial
memorandum and on brief has focused on negligence or disregard of
rules or regulations as the basis for the penalties.

To the extent that we have ruled in petitioners' favor, some
or all of the underpayments and corresponding penalties may have
been eliminated.  However, to the extent that our rulings in
respondent's favor and concessions by petitioners are shown after
Rule 155 computations to leave in place any portion of the
determined underpayments, the record in this case satisfies
respondent's burden of production under section 7491(c) with
respect to negligence.  The evidence adduced reveals a serious
dearth of adequate records and substantiation for many claimed
items.  At the same time, petitioners inexplicably failed to
report various amounts expressly reported to them on Schedules K-
1.  With this threshold showing, the burden shifts to petitioners
to establish that they acted with reasonable cause and in good
faith.

Argument by petitioners specifically directed toward the penalties is limited to the following statement on reply brief:

> Petitioner pleads with the court to accept that Petitioner indeed relied on Ernst & Young for both the LBO structure and all tax matters and that Petitioner did not have cause it [sic] not trust their tax advise [sic] until Petitioner was provided access to evidence from company bankruptcy court requested documents, and that Petitioner did not intentionally cause his tax returns to be in error, especially with the large Tax Basis that Petitioner made the assumption that he had a right to...

Thus, petitioners here would seem to assert a reliance defense as the grounds upon which they should be relieved of liability for the section 6662(a) penalties.

The record, however, is insufficient to support such a defense. While the Court has little doubt that petitioners relied on E&Y's work at various junctures during Mr. Gleason's participation in the LBO transaction, the nexus between that work and the specifics reported on petitioners' returns is simply unclear. The returns and amended returns were all professionally prepared, either by Thomas & Associates or by Plante & Moran, LLP. Nothing in the record addresses the qualifications of those firms. Petitioners have also declined to offer any evidence, or even allegations, with respect to the information provided to the preparers or the extent to which such information might have incorporated work generated by E&Y.

Consequently, although the Court sympathizes with petitioners and is confident that they did not set out

intentionally to submit erroneous returns, the paucity of explanatory material in the record fails to exclude the possibility that they were negligent in their reporting.  Should computations reveal remaining underpayments, section 6662(a) penalties are applicable.

To reflect the foregoing and concessions made,

<u>Decision will be entered under Rule 155</u>.